## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CHRISTOPHER M. CHAISSON,

       Plaintiff,

v.                                   CIV 10-0372 WJ/KBM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

# PROPOSED FINDINGS
# AND
# RECOMMENDED DISPOSITION

THIS MATTER is before the Court on Plaintiff Christopher M. Chaisson's motion to reverse and remand the Administrative Law Judge's ("ALJ") decision that denied social security disability benefits. *See Docs. 15-17.* Having meticulously reviewed the entire voluminous record, and for the reasons below, I recommend that Plaintiff's motion be denied. *See, e.g., Grogan v. Barnhart,* 399 F.3d 1257, 1262 (10th Cir. 2005).

## I.  Background

Plaintiff is a young veteran who served in the military for six years, including a tour of duty in Iraq.  There he suffered a knee injury in an explosion, underwent knee surgery in February 2006, and recuperated at Walter Reed Hospital in the United States.  His military service ended in July 2006.  He alleges ongoing physical and mental disabilities that began on

February 27, 2006, and that his disabilities stem from his injured knee, a lumbar strain, traumatic brain injury, and post-traumatic stress disorder.  *See Administrative Record* ("*Record*") at 7, 10; *Doc. 15* at 1-2;  *Doc. 16* at 1.

Plaintiff filed his claim in New Hampshire, and ALJ Sean Teehan from Massachusetts heard the matter.  Raymond Kelly, an attorney in New Hampshire, represented Plaintiff during the initial proceedings and at ALJ Teehan's initial hearing.  *See, e.g., Record* at 31, 41, 185-187. New Hampshire and Massachusetts are "Region 1" states where the Administration utilizes a Decision Review Board ("Board"), rather than the Appeals Council, to evaluate and review ALJ decisions.  *See id.* at 7, 305, 308.  Therefore, even though Plaintiff moved from the East Coast to New Mexico during the course of these proceedings, the "Region 1" rules and procedures continued to apply.[1]

ALJ Teehan's notice of his first decision informed Plaintiff that the Board had selected his claim for review.  *Id.* at 219.[2]  Soon thereafter, Plaintiff sent a *pro se* "to whom it may concern" letter to the Board.  *See id.* at 238-241.  The letter accused ALJ Teehan of "bias" and "judicial misconduct" because of general delay in the case and the length of the hearing. Plaintiff also challenged the merits of the denial, and asked that the "decision" and the "file" be "reviewed."  *Id.* at 238-40.

---

[1]   *See* Richard C. Ruskell, SOC. SEC. DISAB. CLAIMS HANDBOOK § 1:21 & n.2 (Westlaw Database Updated April 2011) (noting "Region I states include . . . Massachusetts, New Hampshire [and] if a claimant moves, the process under which an application was originally filed will apply throughout") (citing "20 C.F.R. Part 405, Subpart A, Appendix).

[2]   The Board consists of administrative law judges appointed by the Commissioner.  According to the regulations, a claimant cannot appeal to the Board and, instead, the Board selects the decisions it will review.  *Compare* 20 C.F.R. § 405.405(a) (regulations pertaining to Board), *with* 20 C.F.R. §§ 404.966(a) (regulations pertaining to Appeals Council).  The Board may not select decisions for review "based on the identity of the administrative law judge who decided the claim."  *Id.,* § 405.410(a)(2).  Rather, it focuses on claims "where there is an increased likelihood of error or that involve the application of new polices, rules, or procedures."  *Id.*

The Board's decision does not indicate why it selected Plaintiff's case for review, but it did address the assertions in Plaintiff's letter.  For example, the letter, the Board's decision, and Plaintiff's motion to remand all note that Plaintiff's claim was to have received expeditious treatment by the Administration because of his military status.  The agency's guidelines in HALLEX I-2-1-40(D) reflect that policy.[3]  In its decision, the Board also noted that the case was properly designated as a "Military Casualty Case," and specifically "apologize[d] for the delay," but found no basis to conclude the delay was based on "bias or judicial misconduct." *Id.* at 245.[4] Like the United States, I do not interpret Plaintiff's citation to the policy as an independent ground for relief.  *See Doc. 15* at 26; *Doc. 16* at 2; *Doc. 17* at 7.

The Board reversed for several reasons,[5] and remanded with specific instructions for ALJ Teehan to:  further consider the opinions of treating, examining, and non-examining sources; further evaluate Plaintiff's subjective complaints; supplement the record with evidence from a mental health expert "concerning the nature and extent of the claimant's impairments and whether they meet or equal the severity of an impairment;" if necessary, supplement the record with evidence from a vocational expert "to clarify the effect of the assessed limitations on the claimant's occupational base;" offer Plaintiff a new hearing; "take any further action needed to complete the administrative record;" and issue a new decision." *Id.* at 244-45.

---

[3]   *See Doc. 15* at 26; *Record* at 245; http://www.ssa.gov/OP_Home/hallex/I-02/I-2-1-40.html; http://www.ssa.gov/woundedwarriors/.

[4]   Plaintiff filed his application in December 2007, received his first hearing in December 2008, and the ALJ issued his first decision in March 2009.  *See, e.g., Record* at 222.

[5]   The Board reversed because ALJ Teehan:  (1) substantially relied on state agency physician Nicholas Kalfas' opinion, but that decision warranted further consideration in light of later-received "substantial evidence from the Veteran's Administration" and Dr. Lanier Summerall; (2) failed to adequately consider the opinions of treating psychiatrists Robert G. Mayer and Eric Chapman that indicated Plaintiff suffered "marked limitations;" (3) failed to "resolve the inconsistencies regarding the extent of the functional limitations caused by the claimant's traumatic brain injury;" and, (4) used nonwork-like "National Guard Drills" activities as a factor that undermined Plaintiff's credibility.  *Id.* at 243-44.

ALJ Teehan complied with all of these instructions.  He conducted the new hearing in Albuquerque, where new counsel represented Plaintiff and supplemented the record with additional medical evidence.  *See, e.g., id.* at 1, 104, 106-108 (the same firm that represents him in this appeal).  Plaintiff appeared and testified, as did medical expert Dr. Alfred G. Jonas and new vocational expert Cornelius Ford.  *E.g., id.* at 104.  Plaintiff's wife and a security guard observed the hearing.  *See id.* at 104, 106.  ALJ Teehan then issued his second opinion on March 26, 2010 again finding Plaintiff not disabled.  *See id.* at 7-25.  That decision became final when the Board wrote Plaintiff to advise that it did not complete its review within ninety days.  *See id.* at 1 (citing 20 C.F.R. § 405.420(a)(2)).  This timely appeal followed.[6]

Presiding District Judge William Johnson referred the case to then- Chief Magistrate Judge Richard Puglisi for a recommended disposition pursuant to 28 U.S.C. §§ 636 (b)(1)(B), (b)(3).  The Clerk subsequently reassigned the matter to me.  *See Docs. 14, 19.*

## II.  Standard Of Review

Because Plaintiff filed this action after he moved to New Mexico, Tenth Circuit law applies.[7]  If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and Plaintiff is not entitled to relief.  *See Hackett v.*

---

[6]  *See* 20 C.F.R. § 405.420(a)(2) ("If the Board does not complete its review within 90 days . . . the administrative law judge's decision will become our final decision.  If you are dissatisfied with this final decision, you may seek judicial review. . . within 60 days of the expiration of the 90–day time period"); *Record* at 2 (Board letter dated June 29, 2010, stating:  "The 60 days start the day after you receive this letter.  We assume you received this letter 5 days after the date on it unless you show us that you did not receive it within the 5-day period."); *Doc. 1* (filed August 25, 2010).

[7]  *See Andrews v. Astrue,* 2009 WL 4573239 at *1, n.3 (W.D. Ark. 2009) (rejecting argument that Tenth Circuit law applied where "a substantial portion of the administrative proceedings took place in Utah" because "Plaintiff was domiciled in the Western District of Arkansas *at the time she filed this appeal*, thus making the Western District the proper venue [and] the ALJ applied statutory law and agency regulations, which are uniform throughout the nation") (emphasis added).

*Barnhart,* 395 F.3d 1168, 1172 (10ᵗʰ Cir. 2005).  A deficiency in either area is independent

grounds for relief.  *See Hamlin v. Barnhart,* 365 F.3d 1208, 1214 (10ᵗʰ Cir. 2004).

     "'Substantial evidence is more than a mere scintilla and is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"  *Flaherty v. Astrue,* 515

F.3d 1067, 1070 (10ᵗʰ Cir. 2007) (quoting *Grogan,* 399 F.3d at 1261-62).  I can neither reweigh

the evidence nor substitute my judgment for that of the agency.  *Hamlin,* 365 F.3d at 1214; *see*

*also, e.g., Cowan v. Astrue,* 552 F.3d 1182, 1185 (10ᵗʰ Cir. 2008); *Langley v. Barnhart*, 373 F.3d

1116, 1118 (10ᵗʰ Cir. 2004); *Martinez v. Astrue,* 2011 WL 1549517 at 4 (10ᵗʰ Cir. 2011).

     Thus,

> "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Zoltanski,* 372 F.3d at 1200.  We may not "displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Id.*

*Lax v. Astrue,* 489 F.3d 1080, 1084 (10ᵗʰ Cir. 2007).

     Five steps comprise the sequential evaluation process that governs social security benefit

claims.  *E.g., Bowen v. Yuckert,* 482 U.S. 137, 140-41 (1987); *Wilson v. Astrue,* 602 F.3d 1136,

1139 (10ᵗʰ Cir. 2010).  Plaintiff raises several arguments in favor of remand, all of which relate

exclusively to Steps 4 and 5 of the sequential process.

     The burden of proof at Step 4 lies with the claimant, and the Step 4 analysis consists of

three phases.  The ALJ must first must assess and determine the claimant's residual functional

capacity ("RFC"), then determine the demands of the claimant's past relevant work and, lastly,

consider, in light of this RFC, whether the claimant can still do his or her past relevant work.

The RFC phase of Step 4 must include all of the claimant's impairments, including impairments

that are not severe.  *E.g., Winfrey v. Chater,* 92 F.3d 1017, 1023 (10th Cir. 1996) ("Step four . . .

is comprised of three phases"); *Parise v. Astrue,* 2010 WL 4846097 at **2-3 (10th Cir. 2010)

(discussion of three phases).  The determination also necessarily involves the ALJ's resolution of

the claimant's credibility and application of the treating physician rule.  *E.g., Poppa v. Astrue,*

569 F.3d 1167, 1171 (10th Cir. 2009) ("credibility and RFC determinations are inherently

intertwined"); *Daniell v. Astrue,* 384 Fed. App'x 798, 801 (10th Cir. 2010) (treating physician

opinions at Step 4 RFC determination)

   If the claimant cannot perform his or her past relevant work, then the burden of proof

shifts to the Commissioner at Step 5, where the inquiry concerns whether the claimant is capable

of performing another job available in the national economy, given his or age, education, and

work experience.  *E.g., Wilson,* 602 F.3d at 1139; *Raymond v. Astrue,* 621 F.3d 1269, 1274-75

(10th Cir. 2009).

## III.  Step 4 Analysis

### A.  ALJ's Residual Functional Capacity Finding

   The regulations define "medium work" as work that "involves lifting no more than 50

pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20

C.F.R. § 404.1567(c).  ALJ Teehan concluded that Plaintiff "has the residual functional capacity

to perform medium work as defined" in that regulation, with certain qualifications.  *Record* at

17.  As for the physical requirements of the work, he concluded that Plaintiff is able to "sit,

stand, and walk for up to 6 hours of an 8-hour day," but only able to "occasionally climb stairs

and ramps, climb ropes, ladders, or scaffolds, balance stoop, kneel, crouch, and crawl."  *Id.*  As

for nonexertional demands, the ALJ concluded that Plaintiff is able to "cope with a low-stress

non-confrontational environment," and defined a "low stress setting" as an environment that "requires simple decision making" and "adjustment to [only] occasional changes at work."  *Id.* ALJ Teehan explained the basis underlying his conclusions in great detail, including a discussion of the medical evidence, the weight he gave to the opinions of various doctors, why he could not accept Plaintiff's assertion as "fully credible," and why he gave little weight to the Veteran's Administration ("VA") disability determination.  *See Record* at 15-23.

Plaintiff challenges the ALJ's residual functional capacity finding as contrary to the law and substantial evidence.  *See Doc. 15* at 15.

## B.  VA Disability Rating

Plaintiff notes that the VA initially gave him a "90%" disability rating and, some seven months after ALJ Teehan's latest decision, raised the rating to "100%."  *Doc. 17* at 6, n.1; *see also Doc. 15* at 25-26.  As the Commissioner points out, the initial 90% rating represents the sum of "service connected" disabilities in different areas – 50% for post-traumatic stress disorder, 10% for the right knee, 10% after shoulder surgery, 10% for headaches due to trauma/traumatic brain injury, and 10% for a fractured pinky finger of his right hand.  *See Doc. 16* at 17; *Record* at 934-36.  ALJ Teehan considered the VA disability rating, and noted that such ratings are not controlling because they are not based on the same criteria as social security disability law.  He gave the VA rating "little" or "diminished" weight because it was "not supported by the medical and testimonial record" ALJ Teehan reviewed, and because it was "inconsistent with" ALJ Teehan's residual functional capacity finding.  *Record* at 19.

Plaintiff contends that the ALJ's "inconsistency" comment is legally insufficient because it does not explain why ALJ Teehan found the "VA's ***RFC*** finding was not persuasive."  *Doc. 15*

at 26 (emphasis added); *see also Doc. 17* at 5-6.  In support, he cites *Hamlin* and *Grogan*.  I

disagree.  Contrary to Plaintiff's characterization, the VA did not make a "residual functional

capacity" finding in the way that social security law analyzes the phrase.  *See* 20 C.F.R.

§ 404.1545.

Also, Plaintiff's argument takes the ALJ's "inconsistency" comment out of context.

Though the ALJ's reasons could have been phrased more precisely, they are clear and

multifaceted – the VA rating is not binding, it was not based on the same criteria ALJ Teehan

used in arriving at his  decision, and, it was not based on the same record ALJ Teehan reviewed.

In that context he rejected the VA rating as "inconsistent."  Finally, neither case Plaintiff relies

upon stands for the legal proposition that an "inconsistency" rationale like the one employed

here is a legally-impermissible basis to reject a VA rating.

In fact, both cases are inapposite because they involve a situation where the ALJ failed to

consider the VA disability rating at all.[8]  The exact opposite occurred here.  ALJ Teehan applied

the correct legal standards because he observed that, even though the VA rating is not binding,

he was required to consider it and to explain why he rejected it.  *See Grogan,* 399 F.3d at 1262

("Although another agency's determination of disability is not binding on the Social Security

Administration, 20 C.F.R. § 416.904, it is evidence that the ALJ must consider and explain why

he did not find it persuasive.") (citing *Baca v. Dep't of Health & Human Servs.,* 5 F.3d 476, 480

---

[8]   In *Hamlin* the ALJ rejected the opinions of two treating physician who treated the claimant for years
and who, during the course of that treatment, reviewed the claimant's VA medical records.  Those VA
records supported the opinions.  The Tenth Circuit found the ALJ's wholesale rejection of the treating
physicians' opinions erroneous because the ALJ did not properly support his conclusion with specific,
legitimate reasons.  *Hamlin,* 365 at 1216-19.  As a final note, the decision observed that the ALJ "also
erred in failing to adequately consider Mr. Hamlin's disability rating by the VA."  *Id.* at 1219.  In context,
it seems clear that the *Hamlin* ALJ  failed to consider the VA disability rating at all.  *Id.*  Likewise, the
ALJ in *Grogan* failed to consider the VA rating.  *Grogan,* 399 F.3d at 1262-63.

(10th Cir. 1993)); *Hamlin,* 365 at 1219 ("disability rating by the VA which, although not binding

on the Commissioner, is 'entitled to weight and must be considered.'") (quoting same).

## C.  Credibility

Plaintiff testified that he is unable to work because his traumatic brain injury and PTSD

leave make it difficult to retain information and cause him to have episodes two to five times a

week where he is "incoherent" for twelve to eighteen hours.  *Record* at 130, 135.  The conditions

also cause anxiety, and Plaintiff becomes overwhelmed by crowds.  *Id.* at 135.  In addition to

other basic daily activities, he limits his driving, works only five hours a week, attends school,

builds model ships, watches televisions and spends considerable time reading.  *Id.* at 135-37.

ALJ Teehan found that he could not "accept the claimant as a fully credible witnesses" for three

primary reasons.  *See id.* at 10.  He accepted the medical expert's testimony that "a significant

degree of malingering was present in this case."  *Id.* at 21.  He also found that Plaintiff

"functioned very successfully on a sustained basis mentally and physically in a variety of

settings,'" including "very large classes in New Mexico, more than one work setting, a

gymnasium, and a National Guard station."  *Id.*  He also found that Plaintiff made contradictory

assertions.

"'Credibility determinations are peculiarly the province of the finder of fact, and we will

not upset such determinations when supported by substantial evidence.' . . .  At the same time,

we have indicated that 'findings as to credibility should be closely and affirmatively linked to

substantial evidence and not just a conclusion in the guise of findings.'"  *Raymond,* 621 F.3d at

1272-73 (quoting *Hackett,* 395 F.3d at 1173).  Taking Plaintiff's arguments for remand as a

whole, he challenges only the malingering, work, and school aspects of the ALJ's credibility

determination.  He does not challenge the "contradictions" portion of the ALJ's rationale.[9]

### (1)  Malingering

Based on the medical expert's testimony, ALJ Teehan found malingering was one of

Plaintiff's "severe impairments" at Step 3, intertwined with the "possible PTSD" impairment.

*See id.* at 10, 15.  Plaintiff does not challenge the ALJ's Step 3 determination, but does challenge

the malingering rationale in the context of the ALJ's credibility finding.  Plaintiff argues that the

evidence does not support the medical expert's opinion and that the ALJ thus erred in adopting

that opinion.  *Doc. 15* at 22-25.  The Commissioner argues that the malingering rationale "was

only one minor point, and the ALJ considered several other factors in evaluating Chaisson's

credibility."  *Doc. 16* at 12.  Plaintiff replies that "[o]nce the issue of malingering is factored out

of the analysis, there is no substantial evidence to support the ALJ's conclusion that Mr.

Chaisson was not 'a fully credible witness.'"  *Doc. 17* at 5.

The dispositive consideration is that Plaintiff's malingering arguments ask the Court to

reweigh the evidence and substitute its judgment for that of the agency.  For example, Plaintiff

---

[9]  One of the contradictions cited by ALJ Teehan arose at the first hearing where Plaintiff testified that he was absent frequently from his job at the American Legion in New Hampshire due to of physical and emotional difficulties and doctor appointments.  A subsequent letter from his supervisor indicated the reasons for his absences were "for many other reasons including power outages, veterinary appointments, and moving days."  *Id.* at 21; *see also id.* at 235 (ALJ Teehan's first opinion noting same contradiction but that, because Plaintiff was alleging a closed period of disability, his work at the American Legion was "not relevant to the current decision."); *id.* at 7 (ALJ Teehan's second opinion noting Plaintiff amended his request and ongoing disability from onset to present; *compare id.* at 54 (Plaintiff's testimony at first hearing 12/4/08; "Q.  Did you have to give reason for those sick days or absences? A:  back pain, headaches, a lot of anxiety . . . there's just been a few in there for doctors appointments also with my therapist, and like I (inaudible)."), *with id.* at 1046 (Exhibit 17F, cited by ALJ; supervisor letter dated 12/24/08 stating Plaintiff "has missed a (sic) more than six days for a variety of reasons, such as medical & dental appointments, power outages, veterinary appointments, and moving days.").  The other contradiction cited by ALJ Teehan was fact that, although Plaintiff alleged severe PTSD, "he was able to study the history of World War II without apparent difficulty."  *Id.* at 21.

contends that the malingering diagnosis in the VA records was made only once in Spring 2006, but that the "autocites refresh" function of the records makes it appear over and over in later entries. *See Doc. 15* at 22; *Record* at 963, 970, 981.[10]  Counterbalancing that single diagnosis, (1) treating VA psychiatrist Dr. Eric Chapman marked the "no" option on a form authored by attorney Raymond Kelly in response to the question "Is your patient a malingerer?"  *See Doc. 15* at 22; *Record* at 948, and (2) no other "treating doctor spoke of the diagnosis of malingering," *Doc. 15* at 24.  Plaintiff argues that the isolated VA malingering diagnosis does not outweigh the "voluminous records in which there was not mention of malingering." *Id.* at 22.  Therefore, Plaintiff asks this Court to find that the medical expert had no basis to conclude the record showed a "fairly clear dynamic of malingering" in the face of "hundreds of pages of treatment records" to the contrary. *Id.* at 24 (internal quotations and citation omitted).  Plaintiff also asks the Court to disregard the medical expert's opinion that "the references to the cause of PTSD in this case are inconsistent," because it is an "affront to [his] wartime experiences" and contrary to his "clear and consistent PTSD diagnosis" by "the many qualified experts who met and evaluated Mr. Chaisson in a clinical setting." *Id.* at 25 (same).

---

[10]   The "problems" section of these medical records appears to record a comprehensive running list of all the conditions the VA encountered and/or addressed with Plaintiff.  The section lists:  "adjustment disorder with disturbance of emotions and conduct; arthropathy of the knee/patella/tibia/fibula; cannabis abuse; head injury; anxiety disorder NOS; dislocation of lumber vertebra; dislocation of thoracic vertebra, dislocation of cervical vertebra closed – second, segmental dysfunction of sacrum; joint pain, localized in the knee; no psychiatric diagnosis or condition on Axis 1; other physical therapy; back strain lumbar; visit for military services physical separation, headache, joint pain, localized in the ankle; backache; arthropathy of the knee/patella/tibia/fibula; lumbago; disorder of the knee joint/patella/tibia/fibula; muscle spasm; inflammatory myopathy (myositis); unspecified muscle strain; sciatica; malingering; midback pain; back strain sacroiliac region chronic lumbosacral strain; sprain lumbar; back strain; cervicalgia; cocaine-related disorders; psychiatric diagnosis or condition deferred on Axis II; Axis V Global Assess of Functioning (GAF) scale [blank] (100-0); Axis IV psychosocial and environmental problems; psychiatric diagnosis or condition deferred on Axis III;  tension-type headache chronic; anxiety; otitis externa; muscular atrophy; insomnia; ankle sprain; neuralgia occipital; demonstrated behavior mannerisms grinding teeth; headache syndromes; after care following surgery of musculoskeletal system; visit for issue repeat prescription." *Id.* at 963-64; *see also id.* at 970-71 (same); *id.* at 981-82 (same).

An ALJ cannot "'pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability.'"  *Korum v. Astrue,* 352 Fed. App'x 250, 253 (10th Cir. 2009) (quoting *Robinson v. Barnhart,* 366 F.3d 1078, 1083 (10th Cir. 2004) (per curiam)); *see also e.g., Wall v. Astrue,* 561 F.3d 1048, 1067 (10th Cir. 2009) (citing *Frantz v. Astrue,* 509 F.3d 1299, 1303 (10th Cir. 2007)).  He or she must consider all of the evidence.  *E.g., Holcomb v. Astrue,* 389 Fed. App'x 757, 760 (10th Cir. 2010) (citing Ruling 06-03p, 2006 WL 2329939, at *4 (9/8/06)).  However, ALJs are not required to discuss every piece of evidence, and a failure to "discuss the pieces of evidence" identified by the claimant "is not reversible error."  *E.g., Korum,* 352 Fed. App'x at 253.  Instead, they are only required to discuss  evidence they relied upon to support their decision, uncontroverted evidence they chose not to rely upon, and probative evidence they reject.  *Id.* at 253-45 (citing *Clifton v. Chater,* 79 F.3d 1007, 1009-10 (10th Cir.1996)); *see also, e.g., Wall,* 561 F.3d at 1067 (citing *Frantz,* 509 F.3d at 1303).

I recognize that ALJ Teehan did not specifically mention Dr. Chapman's "no malingering" check mark, but Dr. Chapman's "malingering opinion" was not uncontroverted and the ALJ did not rely on it.  And, in context of the opinion as a whole, ALJ Teehan's lack of discussion of this particular aspect of the opinion does not automatically or necessarily lead to the conclusion that he conveniently ignored it.  ALJ Teehan plainly reviewed the exhibit that memorialized all of Dr. Chapman's "opinions" – Exhibit 15F – and he explained why he declined to give it "significant" weight.  After his discussion of the medical and other evidence, ALJ Teehan declined to give "controlling" or even "significant" weight to treating and other opinions that he considered "inconsistent" with the "record as a whole," including Dr. Chapman's.  *Record* at 22-23.  Instead, ALJ Teehan accorded "significant weight to the opinion of the medical expert . . . because he is an impartial psychiatrist who thoroughly reviewed the

-12-

medical evidence of record and listened to the claimant's hearing testimony." *Id.* at 23; *see also id.* at 11-22. Thus, the record instead amply demonstrates that ALJ Teehan considered all of the evidence, and in no way wholly ignored Dr. Chapman. *See, e.g., Korum,* 352 Fed. App'x at 254 ("The eight single-spaced pages devoted to discussing Ms. Korum's impairments, the various medical opinions, and the reasons for the ALJ's RFC assessment demonstrate that the ALJ adequately considered the evidence."); *Crane v. Astrue,* 369 Fed. App'x 915, 920 (10th Cir. 2010) ("But Dr. Spradlin's GAF evaluation was not uncontroverted; and the ALJ, for the reasons given for his not accepting Dr. Spradlin's diagnosis, did not need to find her GAF scoring to be significantly probative.").

Also, I disagree that the sheer number of pages in the record renders the evidence supporting or rebutting a malingering diagnosis overwhelmingly one-sided or that Judge Teehan's decision is not supported by substantial evidence. ALJ Teehan was faced with two diametrically opposed opinions: (1) a treating source who found no malingering, and (2) an impartial medical expert who, after noting the malingering diagnosis made by a third treating source, was of the opinion that the diagnosis of malingering "does seem to account for some [of] the other discrepancies in the record." *Record* at 150. The expert testified in great detail about the discrepancies and inconsistencies in Plaintiff's medical records concerning whether he suffered PTSD, depression, a panic disorder, a personality disorder, and/or substance abuse and the interplay of malingering. *See id.* at 150-58. On cross-examination, the expert readily agreed that the malingering diagnosis occurred but once in the course of some three years. *See id.* at 162-63. However, the medical expert also testified that he would have raised the issue of malingering even if it had not previously been diagnosed by someone else:

> Well to be perfectly honest with you . . . I actually was sort of wondering about this long before I saw it in the Walter Reed records, because of the nature of the inconsistencies in this record. It appeared that that's what we were going to wind up looking at, but I didn't see the term mentioned anywhere except in those Walter Reed records, so I would have, I would have brought it to the judge's attention any way, only because I was concerned about it.

*Id.* at 163.

When counsel asked if the "inconsistencies" reflected a somatoform disorder, the medical expert replied in the negative:  "They are not the kinds of things that lead to concern about somatoform disorder.  They are the kinds of problems that lead to concern about malingering."  *Id.* at 164.  When the medical expert offered to "go through this record with you, and show you some of the, the kinds of inconsistencies that I mean," and asked whether Plaintiff's counsel preferred to "take my word for it that there are lots of them," counsel replied "I can take your word for it."  *Id.* at 164.  When counsel indicated she did not understand how numerous treating sources who evaluated Plaintiff concluded he had PTSD but did not mention malingering, the medical expert testified:

> Well I can help you with that.  I, I will tell you that it is, it is the usual automatic posture of treaters of all kinds, doctors and other treaters that they are inclined simply to take the patient at face value and accept whatever the patient tells them.  I have seen very many times that because they have accepted what the patient tells them at face value they have sort of overlooked obvious inconsistencies let's say between what the patient tells them and what the patient shows them.  But because that kind of reflex posture is to accept the patient's history at face value and many doctors approach patients that way, then it is very unlikely that they will think of something like malingering, because they're already predisposed not to.

*Id.* at 165.  Counsel had no further questions.  *Id.*

While Dr. Chapman's check mark "is evidence in the record supporting [Plaintiff's] position, this is not a case in which the record evidence overwhelmingly contradicts the ALJ's opinion or in which the ALJ neglected to discuss material evidence that favors the claimant." *Osborn v. Astrue,* 406 Fed. App'x 296, 301 (10th Cir. 2010). Instead, Plaintiff "essentially asks this court to reweigh the evidence. That we cannot do." *Id.* Moreover, I have consistently taken the position that mere deficiencies in opinion writing is not a basis for remand where the deficiency has no effect on the outcome of the case.[11]

### (2)  Work

The credibility section of Plaintiff's motion focuses exclusively on the malingering argument rejected above. Nonetheless, I cannot overlook that at other points in the motion Plaintiff faults the ALJ's reliance on Plaintiff's work and school experiences as evidence of his functionality, and that these same items underlie part of the ALJ's reasons for not finding Plaintiff credible. As such, I will address those arguments here.

Plaintiff argues that the ALJ relied on work that only lasted a few months and caused him physical pain because these are not positions that could be deemed "substantial gainful activity." *See Doc. 15* at 16, 17. If Plaintiff is suggesting that the ALJ did not apply the correct legal

---

[11]   *E.g., Ruybal v. Astrue,* CIV 07-1060 KBM (Doc. 23 at 18 – "That the ALJ could have been much more comprehensive in her discussion is not a basis for reversing the decision"); *see also, e.g., Draper v. Barnhart,* 425 F.3d 1127, 1130 (8th Cir. 2005) ("'deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case'") (*quoting Reeder v. Apfel,* 214 F.3d 984, 988 (8th Cir. 2000)); *c.f., Wall,* 561 F.3d at 1069 ("we have previously rejected a construction of *Clifton* that, based on a reading of the ALJ's decision as a whole, would lead to unwarranted remands needlessly prolonging administrative proceedings. . . . Here, a remand would serve no other purpose than to needlessly prolong a protracted course of proceedings, which has already spanned over seven years.") (internal quotations and citation omitted); *Harjo v. Astrue,* 2009 WL 1927486 at *2 (10th Cir. 2009) ("We agree that the ALJ's analysis was somewhat lacking. He could have done a better job of tying his impressions of Ms. Harjo's testimony to contrary or supporting evidence in the record. . . . And we have consistently urged ALJs to do so in order to make our review meaningful. . . . But we also agree with the district court that the ALJ's manner of addressing Ms. Harjo's complaints was effective").

standards because his prior work had to be "substantial" or performed in all aspects or performed

full-time, Plaintiff is turning the Step 4 inquiry on its head.  Work activities are highly relevant

to what Plaintiff can do in light of his conditions, and that work need not pass a the definition of

"substantial" and "gainful" to be considered.  Indeed, the regulations expressly include "prior

work" as one of those considerations:

> Evaluating the intensity and persistence of your symptoms, such as pain, and determining the extent to which your symptoms limit your capacity for work —
>
> \* \* \* \* \*
>
> . . . Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. The information that you, your treating or nontreating source, or other persons provide about your pain or other symptoms . . . is also an important indicator of the intensity and persistence of your symptoms. . . . ***We will consider all of the evidence presented, including*** information about your ***prior work record,*** your statements about your symptoms, evidence submitted by your treating or nontreating source, and observations by our employees and other persons.

20 C.F.R. § 404.1429(c)(3); *see also, e.g., Bean v. Chater,* 77 F.3d 1210, 1213 (10th Cir. 1995)

("Social Security Ruling 88-13 . . . requires ALJs to 'investigate all avenues presented that relate

to subjective complaints' of disabling pain, and lists a number of factors that should be

considered.  One factor is the claimant's prior work record.  *Id.*  Thus, the ALJ did not err in

considering that plaintiff quit working several years before the alleged onset of her disability.

Nor did he place undue emphasis on this factor, but considered it as one of several factors

bearing on plaintiff's credibility."); *Campbell v. Astrue,* 525 F. Supp. 2d 1256, 1262 (D.

Kan. 2007) ("A claimant's prior work history is one of many factors an ALJ must consider in

assessing the credibility of a claimant's subjective complaints of disabling pain.") (citing

*Campbell v. Barnhart,* 56 Fed. App'x. 438, 441 (10th Cir. 2003)); *Jaramillo v. Massanari,* 18

Fed. App'x 776, 778 (10th Cir. 2001) ("While, as Mr. Jaramillo argues**,** the ALJ must consider

his prior work history *as one factor* in making his credibility determination, *see* 20 C.F.R.

§ 404.1529(c)(3)") (emphasis original).

　　　Plaintiff also argues that the work he performed does not show an "ability to work on a

'regular and continuing basis'" or "an ability to function."  Plaintiff cites his testimony about his

experiences with three jobs:  the National Guard did not permit him to participate "in the field;"

he could not focus at his job with the electric company and a supervisor told him that he had his

"head in the clouds;" and Plaintiff found his work with the American Legion Office to be

emotionally distressing, causing him to miss work.  *See id.* at 19, 20 (citing *Haga v. Astrue,* 482

F.3d 1205,  (10th Cir. 2007), where the decision addresses the rejection of a "consulting mental

health professional [who] testified about appellant's mental impairments and restrictions").

　　　I find no basis for reversal.  I have already noted the contradictions that led the ALJ to

find Plaintiff missed work at the American Legion Office for other reasons.  Plaintiff does not

challenge this aspect of the ALJ's conclusion, and it is supported by the record.  *See supra* note

7.  Also, no doubt in light of one of the reasons cited by the Board for remand, ALJ Teehan

specifically noted that "[a]lthough the claimant's activities in the national Guard may not have

directly corresponded to specific work tasks, the claimant demonstrated an ability to adhere to a

schedule and complete tasks (of a military nature) while on duty in the National Guard."  *Record*

at 20, 123 413; *see also id.* at 244 (Board found ALJ erred in using nonwork-like National Guard

activities as a factor that undermined Plaintiff's credibility).  As for his electrical job, ALJ

Teehan noted that Plaintiff did not leave because the physical requirements of the job were too

strenuous based on what he told consulting examining psychologist Dr. Darlene Gustavson,[12] **and** that Plaintiff began collecting unemployment benefits the month after leaving his electrical job in July 2007, thereby "affirming that he was ready, able, and willing to work from August to December 2007." *Id.* at 20.

Thus, ALJ Teehan gave explicit reasons that support his decision not to fully credit Plaintiff concerning his prior work experiences. More than a "mere scintilla" of relevant

---

[12]   ALJ Teehan's comment about Plaintiff's statement to Dr. Gustavson originated in his first opinion, and he incorporated it verbatim into his second opinion. ALJ Teehan characterizes Dr. Gustavson's report as reflecting that Plaintiff stated he left the electrical job "not due to his back or knee but due to a change of crew." *See id.* at 20, 234. The actual report states Plaintiff said he "was last able to work 7/2007 because he had a personality conflict with his supervisory who was 'in my face' and he quit before he engaged in aggressive actions." *Id.* at 822. This is an instance where ALJ Teehan's opinion reflects poor drafting, but his point is clear from the evidence in the record.

Plaintiff told consulting examining psychologist Dr. Francis Warman that after he left the military, he "attempt[ed] to take an internship in electronics works and did this for four months, but found that he could not continue due to physical strains." *Record* at 827. This corresponds to Plaintiff's description on his work activity report to the Administration that from May 2007 to July 2007 he was a "lineman (apprentice)" with "Harlan Electric." *See id.* at 409, 410. On his work activity report, Plaintiff states he "began working . . of financial necessity [but] was completely unable to focus – supervisor stated my 'head was in the clouds' [and] I was not using safety onsite as I was never able to put myself mentally where I needed to be . . . I was plagued w/flashbacks cause by triggers from tings as small as diesel fuel on the trucks." *Id.* at 410; *see also id.* at 61 (Plaintiff's testimony at the first hearing; he worked as an "apprentice" for forty hours a week at the electric company, "weather permitting," and was "learning how to work with electricity, putting poles together, setting poles into the ground, digging holes, stocking trucks").

At the first hearing, when Plaintiff commented that he had "problems with the physical aspects of [the job] and mental . . . just couldn't' concentrate, and I was just kind of real laxed and dazical (sic) [lackadaisical]," ALJ Teehan asked if he had "any problems at work there?" *Id.* at 63. Plaintiff replied: "Not really, you know, I had a problem when they switched me to a different crew, but that was about it." When asked to explain what the problem was "with going to another crew," Plaintiff replied: "The guy, they guy, he had something to prove, and just treated me like real – just – he didn't treat me very well" and they had a "personality conflict." He was "asked to leave," "let go," after an incident where he "let go of a pole . . . and dropped it into the main lines [which] could have caused somebody to get hurt, really hurt, because I wasn't really paying attention." *Id.* at 64-65. At the second hearing, when the ALJ was verifying that Plaintiff was moved to a different crew where he did not get along with the foreman, Plaintiff responded in the affirmative. *See id.* at 121. He also indicated getting moved to the new crew was the "last straw," because he "was staring to hurt really bad physically, from climbing poles and the diesel fuel was . . . triggering flashbacks also." *Id.*

evidence supports his conclusion, and the evidence is the sort that a "reasonable mind" would find wholly adequate to support his conclusion.

### (3)  School

Plaintiff acknowledges that in *Gay v. Sullivan,* 986 F.2d 1336 (10th Cir. 1993), the Tenth Circuit held that school attendance is a proper factor for the ALJ to consider.  *See Doc. 15* at 17-18; *Gay,* 986 F.2d at 1339.  He argues, however, that Tenth Circuit decisions post-dating *Gay* "look[] to how successful the claimant was in school – not just school attendance in a vacuum." *Id.* at 18 & n. 8; see also id. at 17 ("the ALJ should look at the quality of Mr. Chaisson's school performance instead of the mere fact that he attended school.").  In support, he cites *Liessmann v. Barnhart,* 49 Fed. App'x 883, 885 (10th Cir. 2002) (claimant "performed quite well there"); *Winslow v. Apfel,* 1998 WL 45495 (10th Cir. 1998) (claimant "getting excellent grades"); *Wilbourn v. Callahan,* 1997 WL 440473 (10th Cir. 1997) (claimant taking five classes that semester and doing "pretty good").

Though his discussion of Plaintiff's school attendance was not particularly concentrated or long, ALJ Teehan did specifically note that Plaintiff testified

> (since alleged onset) [he] attended Southern New Hampshire University.   Currently, he attended Central New Mexico Community College.   At Southern New Hampshire University, his classes had been small and had been comprised of 7-10 students, at Central New Mexico Community College, there were 30-50 students in each class.

*Record* at 14.  He further noted that:  (1) Plaintiff "testified that he attended school and participated in large classes (of 30-50) people ***while also working,***" *id.* at 16 (emphasis added); *see also id.* at 20 (same); (2) Plaintiff "was able to study the history of World War II without apparent difficulty," *id.* at 21, which Plaintiff does not challenge, *see supra* note 9; and, (3) that

Plaintiff "maintained a B average in college course at Southern New Hampshire University and successfully [took] college courses at Central New Mexico Community College," *id.* at 23  Thus, ALJ Teehan did not look simply at Plaintiff's school attendance "in a vacuum;" he considered the size of the classes, attendance while working, course subjects, grades, and not flunking.

Nor did ALJ Teehan consider school attendance alone.  As illustrated above, he considered the medical record, work, school, daily activities, etc.  The Tenth Circuit holds as without merit arguments that an ALJ "erred by considering . . . attendance at cosmetology school and her efforts to find work," when an ALJ "relied on numerous factors in making his credibility determination, and the fact that claimant was able to attend cosmetology school and was looking for work were not the only factors he took into consideration in assessing her credibility."  *Allen v. Apfel,* 2000 WL 796081 at *3 (10th Cir. 2000) (citing *Gay,* 986 F.2d at 1339).  ALJ Teehan engaged in precisely the same sort of analysis the ALJs performed in the opinions cited by Plaintiff.[13]

---

[13]   *See Liessmann,* 49 Fed. App'x at 885 ("The ALJ bolstered his account of Ms. Rutledge's improved medical condition by noting strengths in other aspects of her life.  For instance, he observed that she not only attended school daily, but she performed quite well there.  Commenting on her enrollment in a difficult electronics class, he found that her performance at school contradicted her claim that she was precluded from working because of diminished concentration and memory abilities."); *Winslow,* 1998 WL at *2 ("We also reject counsel's contention that the ALJ improperly relied on claimant's daily activities to reach his RFC determination.  The ALJ did note that claimant was attending a vocational school and getting excellent grades, though he also noted that claimant reported having trouble sitting in classes that last longer than an hour and a quarter and that her teachers allowed her to change positions. . . . However, it is clear that the ALJ relied on numerous factors in reaching his RFC determination, particularly the medical evidence, and the fact that claimant was able to attend and perform well in school and was looking for work were not the only factors he took into consideration. . . . Further, statements regarding daily activities are evidence properly considered under the Commissioner's regulations."); *Wilbourn,* 1997 WL at **1-2 (claimant testified he was taking five classes and doing "pretty good;" court observed that "school attendance may be considered as one factor in the spectrum of evidence considered" and that ALJ considered school "in addition to his daily activities and current medical reports").

Plaintiff contends that the ALJ's reliance upon school attendance was improper because Plaintiff "reported that at the time of the hearing he was struggling in school, although taking just two classes." *Doc. 15* at 18.  For example, Plaintiff

> repeatedly reported that he had difficulty processing reading assignments, math assignments, and had difficulty staying on task. He testified that he became overwhelmed at CNM while taking four classes.  They now offer him special services, such as extra help from teachers, tutoring, and extra time for examinations, which he also received while at school in New Hampshire.

*Id.* at 17 (citing *Record* at 112-14, 1052, 1060, 1077, 1093).  In the credibility context, however, citing Plaintiff's own testimony as contradictory evidence for the ALJ's credibility conclusion simply begs the question of his credibility.  It does not establish that the ALJ's finding of his prior school attendance as "very successful" and on a "sustained basis" both "mentally and physically," is unsupported by substantial evidence.

Accordingly, I find no merit to Plaintiff's claim that ALJ Teehan did not apply the correct legal standards in assessing Plaintiff's school attendance.  And, as with his work finding, above, I find no basis for reversal because the evidence discussed and cited in the ALJ's opinion represents much more than a "mere scintilla" of relevant evidence supports his conclusion, and is of the sort that a "reasonable mind" would find wholly adequate to support his conclusion.

### D. Physician Opinions

Some of Plaintiff's arguments hinge on findings made by physicians and most of these arguments relate to the nonexertional aspect of ALJ Teehan's residual functional capacity finding.  Several medical sources diagnosed Plaintiff with post-traumatic stress disorder ("PTSD"), including:  VA treating psychiatrist Dr. Eric Chapman, with whom Plaintiff had a longstanding-treating relationship, *see Record* at 13 (Dr. Chapman treated Plaintiff at the VA

"since 2007"); *id.* at 947 (same); VA psychiatrist Dr. Robert G. Mayer, a staff psychiatrist who reviewed Plaintiff's records and examined Plaintiff on one occasion in 2007 to evaluate whether Plaintiff suffered from PTSD, *see id.* at 764, 766; *id.* at 767-69 (duplicate); and consulting examining psychologist Dr. Francis Warman, who saw Plaintiff on one occasion, *see id.* at 12-13.[14]

Some medical sources in the record provided evaluations of Plaintiff's abilities in terms of social security disability criteria.  Nonexamining consulting source Dr. Nicholas Kalfas, who evidently is a psychologist of some sort,[15] reviewed the records and submitted a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment.  For the listings "B" criteria, he concluded that Plaintiff had "moderate" difficulties in social functioning, and mild or no limitations in the other three areas.  For RFC purposes he found Plaintiff "moderately" limited in his ability to complete a normal workday and workweek without interruptions, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately in changes in the work setting.  In all other areas he found Plaintiff "not significantly" limited. *See id.* at 841, 845-46.  Dr. Warman submitted a written report in April 2008, that assessed Plaintiff's functioning in four areas and concluded he was "unable" to perform in two of them. Dr. Chapman completed an attorney-authored form that asked about physical and psychological work restrictions and concluded Plaintiff had "moderate" to "extreme" psychological impairments.

---

[14]   Under disability regulations nomenclature, "consultative" physicians are those hired by the Social Security Administration to examine a claimant and prepare a report.  *See, e.g.,* 20 C.F.R. §§ 404.1517-404.1519, 404.1526(d); 404.1527(c)(3).  Conversely, "treating" physicians are doctors that a claimant sees on his or her own initiative.  *E.g., id.,* §§ 404.1517, 404.1519h; 404.1527(b)(3), (d).

[15]   No one identified Dr. Kalfas' credentials – not the Board, ALJ Teehan, the Record index, the parties, or Dr. Kalfas himself.

An ALJ must give "controlling weight" to the opinion of a claimant's treating physician if the ALJ finds that opinion is both "well supported by medically acceptable clinical and laboratory diagnostic techniques ***and*** . . . consistent with the other substantial evidence in the record." *Pisciotta v. Astrue,* 500 F.3d 1074, 1077 (10th Cir. 2007) (emphasis added); *see also, e.g., Hackett,* 395 F.3d at 1173-74. If the ALJ finds the opinion is not supported or consistent, then like any other medical opinion, the ALJ must also decide whether to reject it altogether or to assign it some lesser weight. The factors to consider include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Pisciotta,* 500 F.3d at 1077-78 (internal quotations and citation omitted); *see also Krauser v. Astrue,* 638 F.3d 1324, 1330-31 (10th Cir. 2011); 20 C.F.R. §§ 404.1527(d), 416.927(d).

### (1)  Mental Findings – Dr. Warman's Opinions About Plaintiff's Limitations

Dr. Warman's April 2008 report – Exhibit 5F – opens with the notation that "Charlotte Matteau" was the "examiner" not Dr. Warman. The record and the ALJ's opinion do not explain this discrepancy. *See id.* at 826. In the section of the report section labeled "current level of functioning," Dr. Warman found that Plaintiff has "a normal ability to understand and remember instructions," and "an adequate ability to concentrate and focus on tasks." *Id.* at 829. However, in Dr. Warman's opinion, Plaintiff was "not currently able to interact appropriately or

communicate effectively in work settings," or "able to maintain attendance or follow schedules

in work situations." *Id.*

Plaintiff asserts that ALJ Teehan failed to give Dr. Warman's latter two opinions "any

weight." *Doc. 15* at 19. That is an overstatement because it implies ALJ Teehan ignored the

findings altogether. ALJ Teehan "accepted" Dr. Warman's "normal" and "adequate"

conclusions, but found he could not grant "Dr. Warman's latter two opinions "significant

weight," and gave them less weight than Dr. Kalfas' opinions, but did not wholly reject them.

*Id.* at 22. As grounds, ALJ Teehan stated that Dr. Warman's opinions

> that the claimant was currently not able to interact appropriately or to communicate appropriately in a work setting [and] that significant limitations existed with regard to concentration, and the ability to adapt to a work setting including maintaining attendance and adhering to a schedule . . . are not granted significant weight on the basis that these opinions are ***inconsistent with other evidence of record including the doctor's own assessment of the claimant's ability to concentrate and focus during his examination.*** . . and evidence of the claimant's ability to work with 15-20 people and to function appropriately without incident during the very months of the examination. (Exhibits 4D, 8E). Based on this ***inconsistency with the record as a whole,*** Dr. Warman's opinion cannot be granted significant weight. . . . Dr. Kalfas' opinion is granted greater weight than that of Dr. Warman on the basis that it is more consistent with evidence of record.

*Id.* (emphasis added).[16]

I do not read ALJ Teehan's failure to pinpoint a spot somewhere on the spectrum

between "none" and "less than significant" as running afoul of his obligations under the treating

physician rule. "The question for this court is whether the ALJ's decision contains specific

reasons that make clear the weight assigned to [the] opinion and the reasons for that weight."

---

[16] Exhibit 8E is Plaintiff's report of his work activities from 2006 through in March 2008. *Record* at 409-11. Exhibit 4D is the form where Plaintiff reported his earnings from 2005 through 2008, and he reported $640 each month starting in March 2008 for his "VA w[or]k study." *Id.* at 321.

*Sitsler v. Astrue,* 410 Fed. App'x 112, 119 (10th Cir. 2011) (citing *Hamlin,* 365 F.3d at 1215);

*Boucher v. Astrue,* 371 Fed. App'x 917, 923 (10th Cir. 2010) ("we note that the ALJ did not

'reject' [the] opinion. Rather, the ALJ conducted the . . . analysis to determine what weight

should be given to the opinion and ultimately concluded that the part of [the] opinion

recommending part-time work should not be given 'substantial weight.'").  The above finding

supplies the weight assigned and it is clear.

      Citing pages 17 and 22 of the Record, Plaintiff asserts that ALJ Teehan "concluded that

***Dr. Warman's opinion supports an RFC*** for working in a low-stress, non-confrontational

environment." *Doc. 15* at 19 (emphasis added).  I disagree.  Page 17 simply introduces his

residual functional capacity summary heading and begins the lengthy discussion of the medical

evidence.  Page 22 begin the findings quoted above concerning the weight he assigned to Dr.

Warman's opinion.  The fact that ALJ Teehan "accepted" Plaintiff is able to understand and

concentrate does not logically correlate to the conclusion that Plaintiff has limitations in dealing

with stress, confrontation, decision-making, and changes.  Also, that ALJ Teehan "accepted" or

rejected certain opinions is not the equivalent of relying on them as support for his residual

functional capacity conclusion.  Nowhere on either of those pages does the ALJ expressly or

implicitly make a connection between Dr. Warman's opinions, which he deemed of minimal

significance, and his residual functional capacity finding.  Instead, what ALJ Teehan concluded

"amply" supported his residual functional capacity assessment, *id.* at 23, was his review of the

medical evidence, concluding Plaintiff was less than credible, reviewing and weighing other

opinion evidence, and "accord[ing] significant weight to the opinion of the medical expert,

Alfred Jonas, M.D, Diplomate of the American Board of Psychiatry and Neurology, because he

is an impartial psychiatrist who thoroughly reviewed the medical evidence of record and listened to the claimant's hearing testimony," *id.*

Lastly, Plaintiff argues that the ALJ improperly rejected the more restrictive aspects of Dr. Warman's opinions based on the work activities and earnings from three jobs reflected in Exhibits 4D and 8E, see *supra* note 16 and accompanying text, because none of that work demonstrates an "ability to perform on a 'regular and continuing basis,'" *Doc. 15* at 20 (citing *Haga,* 482 F.3d at 1208 and Soc. Sec. Ruling 96-8p).  As an initial matter, however, ALJ Teehan did not reject the doctor's opinions based on the work alone.  As highlighted above, he specifically also cited "inconsistency with the record as a whole" and Dr. Warman's own internal inconsistencies as a basis to reject the opinions.  Also as noted above, part of that "whole record" includes the ALJ's lengthy and thorough discussion of the medical and other evidence, including Plaintiff's credibility.

In addition, *Haga* is distinguishable.  There, the opinion at issue was "uncontradicted," but ALJ did not discuss his reasoning at all.  "[I]t [was] simply unexplained" why the ALJ adopted some of . . . restrictions but not others."  *Haga,* 482 F.3d at 1208.  The *Haga* panel was unwilling to find an implicit reason why the ALJ rejected the opinion based on the ALJ's "explicit" observation that the claimant testified she "can work two to six hours per day as caretaker for her mother" because claimant's caretaking activities did not show the capacity to work on a regular basis and respond appropriately in a work setting.  *Id.*  In context, it is clear that the claimant's testimony was the only evidence explicitly mentioned by the ALJ that could have supported his decision to reject and uncontradicted opinion, and that testimony was not conclusive of the issue in the first instance.  Thus, *Haga* remanded "so that the ALJ can explain the evidentiary support for his RFC determination."  *Id.*  Unlike *Haga,* this record contains

contradictory opinions on the issue of Plaintiff's limitations and the ALJ explained his

reasoning.  Moreover, ALJ Teehan did not find Plaintiff "fully credible," and that credibility

finding is not subject to remand.

### (2)  Mental Findings – Dr. Chapman's Opinions About Plaintiff's Limitations

Dr. Chapman's questionnaire responses indicated that Plaintiff is either "moderately" to

"extremely" psychologically impaired in several areas such as understanding, remembering,

concentrating, and interacting and getting along with others.  *Record* at 948.  ALJ Teehan

"considered" Dr. Chapman's opinion, but discounted it on the same basis as he discounted Dr.

Warman's, that is Plaintiff's ability to function in work and at school, and Plaintiff argues that

"for the same reasons, this Court should reject the ALJ's reasoning" concerning Dr. Chapman's

opinions.  *Doc. 15* at 20.  For the same reasons above, I find this argument without merit.

### (3)  Mental Findings – Dr. Mayer's "Opinion"

Dr. Mayer is the VA staff psychiatrist who reviewed Plaintiff's records and examined

Plaintiff on one occasion in 2007 to evaluate whether Plaintiff suffered from PTSD.  *See Record*

at 764, 766; *id.* at 767-69 (duplicate).  Like other medical sources, Dr. Mayer found Plaintiff had

"severe PTSD symptoms and panic attacks since returning to the United States," and assessed

Plaintiff as "clearly meet[ing] the DSM-IV stressor criteria for PTSD."  *Id.* at 766.  According to

Plaintiff, "Dr. Mayer expressed the following findings and opinions:  Mr. Chaisson can perform

his activities of daily living, but was anxious, has trouble concentrating at times, has panic

attacks, is intermittently depressed, has insomnia and nightmares, is irritable, and wants to

isolate."  *Doc. 15* at 18-19 (citing *Record* at 765-66).  Dr. Mayer's exact wording included that:

> He is engaged and is living with his fiancé but states there are "lots
> of problems."  He says that she does not understand when he is
> irritable and has mood swings. . . .  He said that there are frequent

confrontations and that he is beginning to think that he needs to get away from her. . . .  He is not currently working but has done some work under the table with friends.  In his leisure time, he goes the gym almost daily for about three hours which he finds helps to reduce stress.

In terms of substance abuse [he] has . . . stopped. . . .

On mental status exam, [Plaintiff] was an alert, anxious, somewhat intense young man who showed no evidence of a thought disorder.  He denied delusions or ideas of reference. . . .  He is able to maintain his ADLs, is oriented in all spheres and can manage his own financial affairs and feels that his memory is all right although he does have trouble concentrating at times. . . .  He does endorse panic attacks. . . .  He reports that he is intermittently depressed.  In terms of his sleep, he goes to bed  . . . with the mirtazapine and sleeps for about four hours but then wakes up for about an hour and then all subsequent sleep is punctuated by nightmares.  He estimates that he is getting about four hours of sleep a night.

ASSESSMENT OF PD: . . . he clearly meets the DSM IV stressor criteria for PTSD. . .

In summary, . . . [Plaintiff] has had severe PTSD symptoms and panic attacks since returning to the United States which continue to the present and he is in active treatment . . . .  He is currently not working and he is having significant difficulties in his relationship with his fiancée . . .  and her inability to deal with his mood swings and confrontations.

*Record* at 765-66.  In his residual functional capacity assessment, the ALJ specifically discussed and "considered" Dr. Mayer's report.  However, he did not treat Dr. Mayer's report as an "opinion" because, while the doctor "documented allegations of symptoms[,] he failed to provide ***a specific opinion*** regarding the claimant's ability to function in a work-like setting." *Id.* at 22.  The ALJ therefore did not assign any particular "weight" to the report.  *Id.*

Plaintiff asserts that the ALJ erred in "discounting" the "opinions" by Dr. Mayer, and in not giving them "significant" weight.  He contends that Dr. Mayer need not have expressed his "opinions" in terms of functional limitations for the ALJ to have given them controlling weight.

*Doc. 15* at 18-19.  I disagree on both counts and generally find the Commissioner's arguments persuasive, so I incorporate them herein by reference.  *See Doc. 16* at 8-11.  To that I add the following.

First, Dr. Mayer does not qualify as a "treating physician" whose opinion is potentially accorded ***controlling*** weight.  "Absent an indication that an examining physician presented 'the *only* medical evidence submitted pertaining to the relevant time period,' the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion."  *Doyal v. Barnhart,* 331 F.3d 758, 763 (10th Cir. 2003) (quoting and retaining original emphasis from *Reid v. Chater,* 71 F.3d 372, 374 (10th Cir. 1995).  Dr. Mayer is not in a significantly different posture than Dr. Wagner, discussed below, who Plaintiff does not contend is subject to the 20 C.F.R. § 404.1527 analysis.

Next, the regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s)."  20 C.F.R. § 404.1527(a)(2).   Dr. Mayer's observations that Plaintiff wants to assign controlling or significant weight are Plaintiff's report of his symptoms, not the doctor's conclusions.  Dr. Mayer's only conclusion was that Plaintiff suffers from PTSD.  *See Cowan v. Astrue,* 552 F.3d 1182, 1189 (10th Cir. 2008) ("Dr. Gietzen's brief statement on the medical form was not a true medical opinion.  It did not contain Dr. Gietzen's judgment about the nature and severity of Mr. Cowan's physical limitations, or any information about what activities Mr. Cowan could still perform.").

In any event, Plaintiff misstates the relevance and import of the general PTSD symptoms Plaintiff reported to Dr. Mayer.  The mere presence of a diagnosis or symptoms does not "automatically mean" that a claimant "is disabled."  *See Bernal v. Bowen,* 851 F.2d 297, 301

(10th Cir. 1988).  Although the "medical opinion" definition includes symptoms, diagnoses, and prognoses, those things cannot be divorced from the what they reveal about a claimant's functionality — "Medical opinions are statements . . . that reflect judgments about the ***nature and severity*** of your impairment(s), including your symptoms, diagnosis and prognosis, ***what you can still do*** despite impairment(s), and your ***physical or mental restrictions.***"  20 C.F.R. § 404.1527(a)(2) (emphasis added).

Likewise, the regulations that defines "residual functional capacity" does so in functional terms — "Your residual functional capacity ***is the most you can still do despite your limitations***."  20 C.F.R. § 404.1545(a)(1) (emphasis added).  The symptoms that Plaintiff reported to Dr. Mayer merely suggest that what Plaintiff "can still do" might be impacted by his PTSD.  Even if he had not also told the doctor that he "has done work under the table with friends," *Record* at 765, the general symptoms he related reveal nothing about the outer bounds of his limitations.   And, in general, an ALJ generally has no "duty" to discuss evidence that has no bearing on the claimant's limitations.  *Watson v. Barnhart,* 194 Fed. App'x 526, 530 (10th Cir. 2006) (an ALJ must discuss significantly probative evidence he rejects).

Finally, and most importantly, even if the above qualify as "opinions" and should have been assigned a weight, I find no grounds for remand.  Based on Dr. Mayer's report and other medical evidence concerning Plaintiff's PTSD, ALJ Teehan concluded that one of Plaintiff's severe impairments was "possible PTSD," but that Plaintiff did not have any resulting symptoms that meet listings criteria severity at Step 3, which require a showing of "marked" limitations, meaning "more than moderate but less than extreme."  *Id.* at 15-16; *see also id.* at 10-17. Plaintiff takes ***no issue*** with that analysis or conclusion.

Furthermore, ALJ Teehan did not discount or reject Dr. Mayer's PTSD diagnosis or the general symptoms Dr. Mayer noted.  *See Allen v. Barnhart,* 357 F.3d 1140, 1145 (10th Cir. 2004).  To the contrary, he acknowledged and "considered" Dr. Mayer's report and findings throughout the entirety of his analysis, just as he did just as he did with the other medical evidence and opinions concerning the functional effects of Plaintiff's PTSD.  *See Record* at 12, 16, 22.  ALJ Teehan plainly factored the PTSD diagnosis into his residual functional capacity finding, because he limited Plaintiff to a low-stress setting that only involves simple decision-making and occasional changes.  He did not believe Plaintiff credible, however, in his overall contention that his symptoms completely preclude him from working.

### (4)  Physical Findings – Dr. Wagner's Opinion

In April 2009, VA doctor Phillip L. Wagner was called upon to give his opinion about Plaintiff's limitations – "Please comment on the veteran's ability to function in his/her normal occupational environment and describe the functional limitations caused by each service-connected disability."  *See id.* at 1111, 1113.  Dr. Wagner reviewed "service medical records," VA records, and had a "face to face eval 1 hour" with Plaintiff, but did not review "private medical records."  *Id.* at 1111.  Among other things, Dr. Wagner was of the opinion that the "loss of function" in Plaintiff's right knee prevented "prolonged standing, carrying, walking and bending" and this limitation "would prevent employment in a physically demanding job requiring any of the above capabilities."  *Id.*

ALJ Teehan concluded Plaintiff is able to "sit, stand, and walk for up to 6 hours of an 8-hour day . . . occasionally climb stairs and ramps, climb ropes, ladders, or scaffolds, balance stoop, kneel, crouch, and crawl."  *Id.* at 17.  Plaintiff asserts that "[t]here is no substantial evidence to support" the ALJ's findings concerning sitting, standing, or walking, and that Dr.

Wagner's opinion is the "most telling evidence" that Plaintiff cannot carry out those functions for up to six hours a day. *Doc. 15* at 6.  The Commissioner maintains that the record shows Plaintiff "did in fact engage in significant work activities and he attended college," which contradict the assertion that Plaintiff is "precluded from prolonged standing or walking." *Doc. 16* at 5.  Plaintiff replies that the ALJ and Commissioner are impermissibly "picking and choosing" evidence that supports denying benefits and ignoring evidence favorable to a finding of disability. *Doc. 17* at 2.

As I discussed in the malingering section, an ALJ must consider all of the evidence, and cannot just "pick and choose," but an ALJ is not required to discuss every piece of evidence. *E.g., Wall,* 561 F.3d at 1067; *Korum,* 352 Fed. App'x at 253.  Although ALJ Teehan did not specifically discuss Dr. Wagner's opinion, he plainly reviewed the exhibit containing this opinion – Exhibit 19F.  For example, he noted that in 2009, "the claimant continued to experience knee discomfort," *Record* at 11 (citing Exhibit 19F), and "chronic back pain," *id*. (same). In the section where he reached his residual functional capacity conclusion, he stated that Plaintiff "was known to suffer a back condition and limited right knee flexion," *id.,* at 18 (citing Exhibit 19F), but concluded "the evidence fails to establish that these conditions would have prevented work within the parameters" the ALJ set for Plaintiff's physical abilities, *id.*

Also, in context, ALJ Teehan did acknowledge the medical evidence showing Plaintiff's continued complaints of knee and back pain and treatment of those conditions.  Some of that evidence was favorable (such as complaints and treatment with narcotic pain medications) and some was not (such as tests yielding negative results).  *See Record* at 17.  For example, ALJ Teehan noted that the earlier opinion of state agency physician Dr. Matt Masewic, "agreed"

Plaintiff's physical capacity of sitting/standing/walking for "no more than 6 hours a day . . . was appropriate." *Id.* (citing Exhibit 3F); *see also id.* at 814, 820.

ALJ Teehan's discussion demonstrates that the evidence about Plaintiff's physical limitations due to his knee condition was not uncontroverted, and provides the basis for why he rejected evidence suggesting a disabling condition based on Plaintiff's knee and the evidence that he did rely upon.

### (5)  Gym Attendance Observation By Dr. Mayer

On page 20 of his option, ALJ Teehan states that Plaintiff "visited a gymnasium for three hours a day nearly every day in January 2007." *Record* at 20.  On the next page, he stated Plaintiff "exercisers] for three hours a day." *Id.* at 21.  In support in both instances, he cited "Exhibit 2F, p. 180," which corresponds to Dr. Mayer's report at page 765 of the Record.  There Dr. Mayer stated Plaintiff reported that, "[in his leisure time, [Plaintiff] goes to the gym almost daily for about here hours which he finds helps to reduce stress." *Id.* at 765.

Plaintiff contends that the record does not support the conclusion that he exercises three hours a day.  "Dr. Mayer only stated that Plaintiff "goes to the gym" for three hours a day to "reduce stress," therefore Plaintiff "may lift weights . . . may do yoga, or simply sit in the snack bar.  The record says nothing about what activities, if any, he performed at the gym." *Doc. 15* at 16.  He thus appears to argue that reliance on the gym factor was improper.

I find it reasonable to conclude that a man who is tense, no longer using recreational drugs, having confrontations with his fiancée, needs to get away from her, and goes to the gym frequently, is engaged in exercise.  And, yoga qualifies as exercise.  Regardless, even if ALJ Teehan overstated by assuming Plaintiff exercises while at the gym, the observation is not

grounds for remand in light of the myriad of other substantial evidence supporting his residual functional capacity finding.

## IV.  Step 5 Analysis

### A.  "Burden" Comment

In his introductory boilerplate remarks about the sequential review process, with respect to Step 5, ALJ Teehan stated that **"[although the claimant generally continues to have the burden of proving disability at this step,** a limited burden of going forward with the evidence shifts to the Social Security Administration [which] is responsible for providing evidence that demonstrates that other work exists in significant number in the national economy."  *Record* at 10.  He used the identical language in his first opinion and the Board did not comment upon it. *See id.* at 224.   Plaintiff cites only the highlighted portion of the above quote, and asserts that it demonstrates ALJ Teehan impermissibly shifted the burden to Plaintiff at Step 5.  *See Doc. 15* at 26-27.

As the Commissioner points out in response, court decisions and an announcement in the Federal Register recite the same language that Plaintiff challenges here.  *See Doc. 16* at 15-16 (and authorities cited therein).  These cases point out that there is a distinction between the Plaintiff's ultimate **burden of persuasion** on the issue of **disability,** and the shift of **burden of production** to the Commissioner at the final step on the issue of work the claimant could perform given his or her residual functional capacity.

"While the burden of production and proof to show other substantial work in the national economy a claimant can perform shifts to the Commissioner, the ultimate burden of persuasion to prove disability remains with the claimant."  *Underwood v. Astrue,* 2011 WL 765879 at *3,

n.5 (N.D. Tex. 2011).  The *Underwood* decision, for example, rejected the argument that the

above language fails to acknowledge the burden shift at Step 5.  In addition, *Underwood* cites the

Commissioner's 2003 explanation for editorial changes to clarify the regulations in

distinguishing between burden of persuasion and burden of production shift at Step 5.  *Id.* (citing

68 Fed. Reg. 51153, 51155 (Aug. 26, 2003).").  In that regulation, the Commissioner used the

exact same language ALJ Teehan used in his decision and, in context, explained:

> Under the Act and §§ 404.1512 and 416.912 of our regulations, you generally have the burden of proving your disability.
>
> . . . In addressing burdens of proof, it is critical to keep in mind that we are using a term in our nonadversarial administrative process . . .
>
> In the administrative process, the burden of proof generally encompasses both a burden of production of evidence and a burden of persuasion about what the evidence shows. . . .  You shoulder the dual burdens of production and persuasion through step 4 of the sequential evaluation process.
>
> ***Although you generally bear the burden of proving disability throughout the sequential evaluation process,*** there is a limited shift in the burden of proof to us "only if the sequential evaluation process proceeds to the fifth step . . .  When we decide that you are not disabled at step 5, this means that we have determined that there is other work you can do. To make this finding, we must provide evidence that demonstrates that jobs exist in significant numbers in the national economy that you can do, given your RFC, age, education, and work experience. In legal terms, this is a burden of production of evidence.
>
> When we decide that you are not disabled at step 5, this means that we have determined that there is other work you can do. To make this finding, we must provide evidence that demonstrates that jobs exist in significant numbers in the national economy that you can do, given your RFC, age, education, and work experience. In legal terms, this is a burden of production of evidence.

*Clarification of Rules Involving Residual Functional Capacity Assessments; Clarification of Use*

*of Vocational Experts and Other Sources at Step 4 of the Sequential Evaluation Process;*

*Incorporation of "Special Profile" Into Regulations,* 68 FR 51153-01, 51154-55 (8/26/03)

(available at 2003 WL 22001943) (emphasis added).

In his reply, Plaintiff argues that the courts cited by the Commissioner are from outside

the Tenth Circuit and that the Commissioner omits decisions in our circuit and this district "that

have rejected that position."  *Doc. 17* at 6.  In support, counsel for Plaintiff relies on *Grogan,* 399

F.3d at 1261, *Hoelscher v. Astrue,* CIV 09-362 ACT, and *Gutierrez v. Astrue,* CIV 09-496 LFG.

However, none of these cases involved a challenge to the language cited above.[17]  The two cases

from this district did, *sua sponte,* take issue with the above-challenged language and found it to

be "incorrect" because *Grogan* states that "[if the claimant successfully meets his burden, the

burden of proof shifts to the Commissioner at step five to show that the claimant retains

sufficient residual functional capacity (RFC) to perform work in the national economy, given his

age, education, and work experience," and an unpublished Tenth Circuit opinion states that a

"claimant has no burden on step five."  *Gutierrez v. Astrue,* CIV 09-496 LFG (Doc. 19 at 4)

(citing *Grogan,* 399 F.3d at 1261 and *Stewart v. Shalala,* 1993 WL 261958 at 1 (10th Cir. 1993));

*Hoelscher v. Astrue,* CIV 09-362 ACT (Doc. 19 at 7) (same).

Nonetheless, neither *Grogan* nor *Stewart* are inconsistent with the explanation in the

Federal Register, above.  Indeed, in context the *Stewart* statement illustrated that a claimant has

no ***burden of production*** at Step 5.  Stewart, 1993 WL at *1 ("[The Secretary bears the burden to

prove by substantial evidence that the claimant retains the residual functional capacity (RFC) to

perform work at some level lower than his past relevant work" and, to meet that burden, the

---

[17]     *See Hoelscher v. Astrue,* CIV 09-362 ACT (Doc. 15 – Plaintiff's motion to remand does not raise this a grounds
for remand); *id.* (Doc. 17 – Plaintiff's reply does not raise this a grounds for remand); *Gutierrez
v. Astrue,* CIV 09-496 LFG (Doc. 15 – Plaintiff's motion to remand does not raise this a grounds for
remand); *id.* (Doc. 17 – Plaintiff's reply does not raise this a grounds for remand); *see also Grogan,* 399
F.3d at 1261 (court's boilerplate recitation of the five steps and the burden-shift that occurs at Step 5).

"***Secretary may not rely on the absence of contraindication in the record***. . . . The claimant has

no burden on step five.") (emphasis added) (citing *Thompson v. Sullivan,* 987 F.2d 1482, 1491

(10th Cir. 1993)).  And, at least one Tenth Circuit decision cites that explanation.  *See Howard v.

Barnhart,* 99 Fed. App'x 227, 230-31 (10th Cir. 2004) ("As a recent Social Security final rule

makes clear, the agency's burden at step five does not include the burden to provide medical

evidence in support of an RFC assessment, unless the ALJ's duty to further develop the record is

triggered.  68 F.R. 51153, 51155 (2003)").

 While I do not disagree with the other judges from this District that the challenged

language could stand reworking, neither of them reversed on the presence of the language in the

ALJ's opinion.  Both simply noted that the "ALJ should revise ***or clarify*** his summary of the

five-step process."  *Gutierrez v. Astrue,* CIV 09-496 LFG (Doc. 19 at 4) (emphasis added);

*Hoelscher v. Astrue,* CIV 09-362 ACT (Doc. 19 at 7) (same).  Finally, none of the cases relied

on by Plaintiff stand for the proposition presented by the facts of this case —that boilerplate

language, taken out of context, in a case in which the ALJ did not in fact shift the burden to the

claimant at Step 5, requires reversal.

 That said, I did find one case in this circuit where a district court remanded on the basis

of the above language.  *See Gordon v. Astrue,* 2010 WL 2990841 at *3 (W.D. Okla. 2010) ("This

language is contrary to the plain language of the applicable regulations, Tenth Circuit case law,

and policy reasons identified by another district court in this Circuit.").  That decision concluded

that the "Commissioner applied the wrong legal standard."  *Id.* (quoting Thompson, 987 F.2d at

1487, where it states that if the ALJ "failed to apply the correct legal test, there is a ground for

reversal apart from a lack of substantial evidence.").

I find *Gordon* unpersuasive because it appears to reach that conclusion simply because the ALJ uttered the challenged language.  As I read the decision, it did not consider whether the ALJ in fact impermissibly shifted the burden in his actual analysis.  I have consistently taken the position that mere deficiencies in opinion writing is not a basis for remand where the deficiency has no effect on the outcome of the case.  *See supra* note 11.  ALJ Teehan's boilerplate recitation had no effect here.

## B.  Frequent Handling/Fingering
### &
### Moderate To Extreme Psychological Impairments

Plaintiff contends that the ALJ erred in adopting the vocational expert's testimony that Plaintiff could perform the jobs of hay sorter, laundry worker, and hand packager.  This claim is based on Plaintiff's testimony that a fracture of his right hand left him with weakness and difficulty with writing and holding objects, "Dr. Wagner's RFC," and on the third and most extreme hypothetical the ALJ posed for psychological impairments.  *Doc. 15* at 21; *see also Record* at 17, 175.

The ALJ did not adopt any of these limitations in his residual functional capacity finding, which is supported by his rejection of Plaintiff's asserted limitations as not fully credible and the other medical evidence of record, and for the reasons above that finding is not subject to remand. *See also Doc. 16* at 11-12 (Commissioner's response discussing evidence pertaining to hand injury).  Accordingly, this claim is without merit.  *E.g., Barnett v. Apfel,* 231 F.3d 687, 690 (10th Cir. 2000) (ALJ did not err in rejecting VE's opinion based on claimant's testimony where record did not establish limitations described by claimant); *Qualls v. Apfel,* 206 F.3d 1368, 1373 (10th Cir. 2000) ("The ALJ propounded a hypothetical question to the VE that included all the

limitations the ALJ ultimately included in his RFC assessment.  Therefore, the VE's answer to that question provided a proper basis for the ALJ's disability decision) (citing *Gay,* 986 F.2d at 1341); *Tucker v. Barnhart,* 201 Fed. App'x 617, 624 (10th Cir. 2006) ("Hypothetical questions 'need only reflect impairments and limitations that are borne out by the evidentiary record.'") (quoting *Decker v. Chater,* 86 F.3d 953, 955 (10th Cir. 1996)).

# V.  Conclusion

Despite the length and comprehensiveness in discussing the voluminous evidence, ALJ Teehan admittedly could have presented his reasoning more precisely.  However, the many disagreements Plaintiff posits, based mainly on his own subjective views of his symptoms, individually and collectively, do not change what is plain from a thorough review of this record. The ALJ conducted two thorough hearings, carried out every request on remand, carefully considered all of the evidence, and compiled a reasoned decision denying benefits.  His reasons are clearly discernable in all respects, in the end comport with the applicable legal standards, and are plainly supported by substantial evidence.   As such, I find no basis to reverse ALJ Teehan's decision.

**Wherefore,**

**IT IS HEREBY RECOMMENDED** that Plaintiff's motion to remand *(Doc. 15)* be denied, and the decision of the Commissioner be affirmed.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____

UNITED STATES CHIEF MAGISTRATE JUDGE